# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

THERESA JOHNSON,

        Plaintiff,

v.                                              Case No:   5:23-cv-403-GAP-PRL

WHALECO, INC.,

        Defendant

## ORDER

This cause came before the Court for consideration without oral argument on Defendant's motion to compel arbitration and dismiss the action (Doc. 20). The Court has also considered Plaintiff's response in opposition (Doc. 21).

**I.  Background**

On June 27, 2023, Plaintiff Theresa Johnson ("Plaintiff") filed a class action complaint, individually and on behalf of others similarly situated, against Defendant Whaleco, Inc. d/b/a TEMU ("Defendant"), an online marketplace for consumer goods, alleging violations of the Telephone Consumer Protection Act ("TCPA"). Doc. 1; *see* 47 U.S.C. §§ 227, *et seq*. The TCPA requires telemarketing companies to maintain do-not-call lists and train their employees to effectively manage and honor those lists. *See* 47 C.F.R. § 64.1200(d). Plaintiff alleges that she

and others requested to be added to Defendant's do-not-call list but that those requests were not honored. Doc. 1, ¶¶ 40-41. She complains that she has suffered invasion of privacy and harassment because of Defendant's actions and seeks injunctive relief and statutory damages. *Id.*, ¶5, 12.

Plaintiff registered to use Defendant's online marketplace on November 10, 2022. Doc. 20 at 81. To register for an account, she was required to enter an email address or phone number, and then click a large, brightly colored "Continue" button. *See id.* at 4-6. At the bottom of the webpage, beneath four other buttons, lies a statement in light grey font that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.* at 5 (emphasis original). Defendant's form is depicted here:



Doc. 20 at 21. Plaintiff maintains that these terms were not conspicuously disclosed to her when she registered to use Defendant's website with this form. Doc. 21 at 1.

On August 21, 2023, Defendant moved to dismiss the case and compel arbitration pursuant to its online terms (the "Agreement"), which include a mandatory arbitration provision. Doc. 20 at 1-3. Defendant argues that its terms and conditions were conspicuously located on its website and, therefore, the valid arbitration clause is binding and the Court must compel Plaintiff to arbitration. *Id.* at 2. Plaintiff argues that Defendant has not demonstrated the existence of an enforceable arbitration agreement and asks the Court to deny the motion. Doc. 21 at 12. The matter is now ripe for review.

**II.    Legal Standard**

In the Middle District of Florida, "[m]otions to compel are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)." *Owings v. T-Mobile USA, Inc.*, 978 F.Supp.2d 1215, 1222 (M.D. Fla. Aug. 15, 2013). Though motions to dismiss under Rule 12(b)(1) can be facial or factual, courts have held that "a motion seeking to compel arbitration [is a] factual attack" because it asserts that a provision of an extrinsic document deprives the court of jurisdiction. *Bell v. Atlantic Trucking Co., Inc.*, No. 3:09-cv-406-J-32MCR, 2009 WL 4730564, *3 (M.D. Fla. Dec. 7, 2009). "Factual attacks…challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and

matters outside the pleadings, such as testimony and affidavits, are considered." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (internal quotation marks omitted). "A district court evaluating a factual attack on subject matter jurisdiction may proceed as it never could at summary judgment and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Hakki v. Secretary, Dep't of Veterans Affs.*, 7 F.4th 1012, 1023 (11th Cir. 2021) (internal quotations and citations omitted). "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence*, 919 F.2d at 1529.

### III. Analysis

Under the Federal Arbitration Act ("FAA"), arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "creates a presumption of arbitrability such that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (internal quotation marks omitted). However, the presumption of arbitrability "does not apply to disputes concerning whether an agreement to arbitrate has been made." *Id.* "The threshold question of whether an arbitration agreement exists is a matter of contract" governed by state

law. *Id.* at 1329-30 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).[1]

The parties here agree that whether the Agreement is binding is a question of Florida law.[2] *See, e.g.,* Doc. 20 at 7, Doc. 21 at 3. Both parties further agree that Florida courts have recognized two principal types of internet contracts: "clickwrap" agreements and "browsewrap" agreements. *See* Doc. 20 at 7, Doc. 21 at 3. The court in *Bell v. Royal Seas Cruises, Inc.*, described these types of agreements succinctly:

> "A 'clickwrap' agreement occurs when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions." *Id.* (quoting *Vitacost,*[3] 210 So. 3d at 762). "A 'browsewrap' agreement occurs when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions." *Id.* (quoting *Vitacost*, 210 So. 3d at 762). Courts generally enforce clickwrap agreements. *Vitacost*,

---

[1] Federal district courts analyze three elements in ruling on motions to compel arbitration in Florida: "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 636 (Fla. 1999). Plaintiff does not dispute the second and third elements of this analysis. *See* Doc. 21.

[2] The Court recognizes that Section 19.4 of the Agreement designates that any disputes arising under the contract will be governed by New York law. Doc. 20 at 62. However, that provision is inapplicable unless and until the Court determines that "the parties actually entered into that agreement in the first place." *Bell v. Royal Seas Cruises, Inc.*, No. 19-CV-60752-RUIZ/STRAUSS, 2020 WL 5742189, n. 1 (S.D. Fla. May 13, 2020); *see also Bazemore*, 827 F. 3d at 1329-30.

[3] *See Vitacost.com, Inc. v. McCants*, 210 So.3d 761, 762 (Fla. 4th DCA 2017).

> 210 So. 3d at 762. Browsewrap agreements, however, "have only been enforced when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *MetroPCS*, 273 So. 3d at 1028 (quoting *Vitacost*, 210 So. 3d at 762).

No. 19-CV-60752-RUIZ/STRAUSS, 2020 WL 5742189, *5 (S.D. Fla. May 13, 2020). Defendant, however, urges the Court to recognize a third hybrid category of "sign-up wrap" agreements, pointing to a purported "body of law in Federal Florida cases." Doc. 20 at 8. But, despite Defendant's mischaracterization, these distinguishable cases were resolved under Florida's existing clickwrap and browsewrap standards.

In *Bell v. Royal Seas*, the court held that the agreement was close enough to a clickwrap agreement under Florida law to put the plaintiff on notice. 2020 WL 5742189 at *6. Moreover, the hyperlink to the terms and conditions there was located directly *above* the "CONTINUE" button and, distinctively, included text explicitly stating that those terms contained a mandatory arbitration provision. *Id.* at *1. The website at issue in *Valiente v. StockX, Inc.* likewise bears little resemblance to Defendant's. 645 F.Supp.3d 1331, 1338 (S.D. Fla. Dec. 9, 2022). There, a user was required to affirmatively check a box—located directly below the registration box—acknowledging that they agreed to the terms and conditions. *Id.* Most importantly, in both of these cases, the district courts found that the registrations constituted

clickwrap agreements, not some form of hybrid agreement. *Id.*; *see also Royal Seas*, 2020 WL 5742189 at *6 ("But in light of the analysis in *MetroPCS*, under Florida law, the design here is close enough to the clickwrap end of the spectrum to provide the requisite inquiry notice.").[4]

Florida courts have held that browsewrap agreements encompass those where "[t]he purchaser can complete the transaction without visiting the page containing the terms and conditions." *MetroPCS Comms., Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018). Defendant's website allowed Plaintiff to do just that: complete her registration without visiting the terms and conditions. *See* Doc. 20 at 4-6. Therefore, Defendant's registration site contained a browsewrap agreement which can only be enforced if Plaintiff had actual knowledge of the terms or if the hyperlink was sufficiently conspicuous. *See Royal Seas*, 2020 WL 5742189 at *5.

Defendant alleges, without support, that Plaintiff "saw the statement."[5] Doc. 20 at 2. However, where "there is no evidence that the website user had actual

---

[4] Defendant's citations to non-Florida district court cases are likewise inapposite. Doc. 20 at 8, 10-12. For instance, *Guadagno v. E*Trade Bank* involved an online application which "provid[ed] a highlighted, bullet-pointed, underlined link to the Agreement," and, to proceed, required applicants to check a box acknowledging they had reviewed such. 592 F.Supp.2d 1263, 1267 (C.D. Cal. Dec. 29, 2008). *Route App, Inc. v. Heuberger* is also distinguishable. No. 2:22-CV-291-TS-JCB, 2022 WL 2316377 *3-*4 (D. Utah Jun. 28, 2022). There the text linking to the terms was "underlined in blue font" and it was located *above* the Continue button. *Id.* The cases from New York also involved readily distinguishable website designs. *See Berkson v. Gogo, LLC*, 97 F.Supp.3d 359, 399-400 (E.D. N.Y. Apr. 9, 2015); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 835 (S.D. N.Y. Jan. 24, 2012).

[5] The Court finds it noteworthy that Defendant chose to highlight the entirety of the

- 7 -

knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *see also MetroPCS*, 273 So.3d at 1029. Because Defendant has produced no evidence that Plaintiff had actual knowledge of the terms, the Court turns to the reasonably prudent user analysis.[6] *See MetroPCS*, 273 So.3d at 1029 (quoting *Vitacost.com, Inc. v. McCants*, 210 So.3d 761, 762 (Fla. 4th DCA 2017)).

Defendant's website design fails this analysis because "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page[] where it is featured." *Fridman v. 1-800 Contacts, Inc.*, 554 F.Supp.3d 1252, 1263-65 (S.D. Fla. Aug. 13, 2021). Most damning to Defendant's attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues.[7] Doc. 20 at 21; *see also* Report & Recommendation, *Goldstein v. Fandango Media, LLC*, No. 9:21-cv-80466-RAR, 2021

---

relevant statement with bold text in its motion to dismiss, but not on its website. *See* Doc 20 at 2, 21.

[6] *See Royal Seas*, 2020 WL 5742189 at *8 ("The party seeking enforcement of an agreement has the burden of establishing that an enforceable agreement exists.") (quoting *CEFCO v. Odom*, 278 So. 3d 347, 352 (Fla. 1st DCA 2019)).

[7] The Court recognizes that the words "Terms of Use" and "Privacy & Cookie Policy" are in bold font. *See* Doc. 20 at 21. However, because the font color is itself such a light grey, even in bold font the words still appear significantly lighter than the conspicuous black and colorful text used elsewhere on the webpage and do not attract attention. *See id.*

WL 6617447, *3 (S.D. Fla. Jul. 27, 2021) (Reinhart, Mag. J.) ("[T]he comparatively miniscule size of the typeface used to notify the purchaser that [s]he is agreeing to certain [t]erms…and its light grey color render it practically unreadable."). This camouflaged font contradicts Defendant's assertion that its registration page displays a "conspicuous hyperlink to [it]s Terms of Use." Doc. 20 at 2. And crucially—it evinces an intent to *conceal* those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate. *See Volt Info. Sciences, Inc. v. Board of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration under the [FAA] is a matter of consent, not coercion…").

The inconspicuous nature of the hyperlinks is further compounded by its poor placement on the website. *See Temple v. Best Rate Holdings, LLC*, 360 F.Supp.3d 1289, 1304 (M.D. Fla. Dec. 27, 2018) (acknowledging the distinction between placing terms and conditions *above* versus *below* the action button on a webpage). "It is not reasonable to expect a user to continue reading below the highly conspicuous purchase button." *Goldstein*, 2021 WL 6617447 at *3; *see also Vitacost.com, Inc.*, 210 So.3d at 765 ("Uniformly, courts have declined to enforce "browsewrap" agreements when the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them."). Here, the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange "Continue"

button. *See* Doc. 20 at 21. This placement does not put a reasonably prudent user on inquiry notice.[8] *See Nguyen*, 763 F.3d at 1177.

Moreover, in contrast to cases like *Bell v. Royal Seas*, the notice that *does* exist fails to put the user on notice of the mandatory arbitration provision. *See id.*; *see also Goldstein*, 2021 WL 6617447 at *4. "In Florida, to incorporate a collateral document into an agreement, the agreement must: (i) specifically provide that the collateral document is being incorporated; and (ii) sufficiently describe the collateral document being incorporated." *Vitacost.com, Inc.*, 210 So.3d at 764-65. Defendant's notice here, tucked away at the bottom of the page in barely visible font, does not put users "on inquiry notice of the arbitration provision." *Id.* at 766; *see also, e.g., Royal Seas*, 2020 WL 5742189 at *7 (finding notice sufficient where the statement *included* explicit notice of mandatory arbitration). Therefore, Plaintiff was not put on notice to the Agreement with Defendant and cannot be compelled to arbitrate this dispute.

---

[8] The Court recognizes that the state circuit court in *Fontanez v. Whaleco, Inc.*, 53-3032CA-00374, (Fla. Polk County Ct. 2023), reached a different conclusion. *See* Doc. 28-1. This Court respectfully disagrees with that court's conclusions regarding the conspicuousness of the hyperlinks, as described above, and also with its shifting of the burden to prove actual knowledge of the agreement. *See id.* at 4-5; *see also infra* note 6. The Court likewise notes that Defendant's other notice of supplemental authority, *Schuster v. Uber Technologies, Inc.*, No. 8:18-CV-2389-T-35JSS, 2019 WL 2536780, *1 (M.D. Fla. Jun. 13, 2019), is inapposite. *See* Doc. 25. While sharing some similarities, in that case Uber's hyperlinks to terms and conditions were in blue, underlined font, which materially distinguishes them from the instant facts. *See* Doc. 25 at 3.

### IV. Conclusion

Accordingly, it is **ORDERED** that Defendant's motion to compel arbitration is hereby **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on October 13, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties